# EXHIBIT 1

THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD BAREBOAT CHARTER
CODE NAME: "BARECON 89"

**PART I**

First Issued by The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974 as "Barecon 'A'" and Barecon 'B'". Revised and amalgamated 1989

Adopted by the Documentary Committee of The Japan Shipping Exchange, Inc., Tokyo

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen, September 1989

| # | Field | Value |
|---|---|---|
| 1 | Shipbroker | H. Clarkson and Co. Ltd. |
| 2 | Place and date | London, 23rd August 2007 |
| 3 | Owners/Place of business | Optasia Inc. / Trust Company Complex / Ajeltake Island, Ajeltake Road / Majuro, 96960 M.H. / Marshall Islands |
| 4 | Bareboat charterers (Charterers)/Place of business | Navig8 Pte Ltd., Singapore. |
| 5 | Vessel's name, Call Sign and Flag (Cl. 9(c)) | FR8 SPIRIT to be renamed 'Navig8 Spirit' |
| 6 | Type of Vessel | motor tanker |
| 7 | GRT/NRT | 30,042 / 13,312 |
| 8 | When/Where built | built 2006, SPP Shipbuilding, Korea |
| 9 | Total DWT (abt.) in metric tons on summer freeboard | about 50,100 |
| 10 | Class (Cl. 9) | DNV |
| 11 | Date of last special survey by the Vessel's classification society | N/A |
| 12 | Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 14) | LOA: 183.00m / Breadth: 32.20m / Depth: 19.10m / Tank Capacity: 54,600cbm / Vessel's Class Certificate to have minimum 12 months validity on redelivery |
| 13 | Port or Place of delivery (Cl. 2) | See clause 28. Safely afloat at a safe and accessible berth, buoy or anchorage within range (to be advised). |
| 14 | Time for delivery (Cl. 3) | See Clause 46. |
| 15 | Cancelling date (Cl. 4) | See Clause 46. |
| 16 | Port or Place of redelivery (Cl. 14) | worldwide within trading limits always within IWL - see also clause 28 |
| 17 | Running days' notice if other than stated in Cl. 3 | 20, 10, 7 and 3 days approximate and 1 day definite notice as received from Sellers. |
| 18 | Frequency of dry-docking if other than stated in Cl. 9(f) | as required by Class - see clause 31 |
| 19 | Trading Limits (Cl. 5) | World wide trading within vessel's class always within IWL but in case Charterers wish to trade outside IWL, they are to ask Owners permission which not to be unreasonably withheld and provide proof of extra insurance if applicable. Ship not to force ice or follow ice breaker. |
| 20 | Charter period | 8 years straight +/- 30 days in Charterers option with chopt 1 + 1 years which to be declared 6 months before commencement of optional years. |
| 21 | Charter hire (Cl. 10) | US $13,000 per day pro rata net to Owners for first 8 years and both optional years. |
| 22 | Rate of interest payable acc. to Cl. 10(f) and, if applicable, acc. to PART IV | see Clause 40 |
| 23 | Currency and method of payment (Cl. 10) | US Dollars/telegraphic transfer |

Computer generated form printed by the authority of The Baltic and Maritime Conference (BIMCO), Copenhagen, using software which is the copyright of Strategic Software Ltd.

*(continued)*



| 24. Place of payment; also state beneficiary and bank account (Cl. 10) *to Owners designated bank account* | 25. Bank guarantee/bond (sum and place) (Cl. 22) (optional) *N/A.* |
|---|---|
| 26. Mortgage(s), if any, (state whether Cl. 11(a) or (b) applies; if 11(b) applies state date of Deed(s) of Covenant and name of Mortgagee(s)/Place of business) (Cl. 11) *will advise after purchase* | 27. Insurance (marine and war risks) (state value acc. to Cl. 12(f) or, if applicable, acc. to Cl. 13(k)) (also state if Cl. 13 applies) *Owners agree the vessel's insured value to be fixed at US$ 53 million for the first three years of the Charter period, US$ 50 million for years 4 and 5, US$ 49 million for years 6 and 7, US$ 47 million for year 8 and US$46 million for years 9 and 10 if declared.* |
| 28. Additional insurance cover, if any, for Owners' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g)) *see clause 37* | 29. Additional insurance cover, if any, for Charterers' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13 (g)) *see Clause 37* |
| 30. ~~Latent defects (only to be filled in if period other than stated in Cl. 2)~~ *N/A* | 31. War cancellation (indicate countries agreed) (Cl. 24) *USA, UK, Japan* |
| 32. Brokerage commission and to whom payable (Cl. 25) *see Special Clause 4* | |
| 33. Law and arbitration (state 26.1., 26.2., or 26.3., of Cl. 26 as agreed; if 26.3.agreed also state place of arbitration) (Cl. 26) *English law, London* | 34. Number of additional clauses covering special provisions, if agreed *Clauses 27 to 44 as attached hereto.* *Special Clauses 1 to 4 as attached hereto.* |
| 35. Newbuilding Vessel (indicate with "yes" or "no" whether Part III applies) (optional) *No* | 36. Name and place of Builders (only to be filled in if Part III applies) *N/A* |
| 37. Vessel's Yard Building No. (only to be filled in if Part III applies) *No* | 38. Date of Building Contract (only to be filled in if Part III applies) *N/A* |
| 39. Hire/Purchase agreement (indicate with "yes" or "no" whether Part IV applies) (optional) *N/A.* | 40. Bareboat Charter Registry (indicate with "yes" or "no" whether Part V applies) (optional) *Yes* |
| 41. Flag and Country of the Bareboat Charter Registry (only to be filled in if Part V applies) *Marshall Islands* | 42. Country of the Underlying Registry (only to be filled in if Part V applies) *TBA* |

PREAMBLE. - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and shall only form part of this Charter if expressly agreed and stated in the Boxes 35, 39 and 40. If PART III and/or PART IV and/or PART V apply, it is further mutually agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | *[signature]* |

Computer generated form printed by the authority of The Baltic and Maritime Conference (BIMCO), Copenhagen, using software which is the copyright of Strategic Software Ltd.

1. **Definitions** 1
   In this Charter, the following terms shall have the meanings hereby assigned 2
   to them: 3
   "The Owners" shall mean the person or company registered as Owners of the 4
   Vessel. 5
   "The Charterers" shall mean the Bareboat charterers and shall not be 6
   construed to mean a time charterer or a voyage charterer. 7

2. **Delivery** (*not applicable to newbuilding vessels*) *Back-to-back with Fr8* 8
   *Spirit MOA dated 23rd August 2007 (See Clause 28).* 9
   ~~The Vessel shall be delivered and taken over by the Charterers at the port or~~ 10
   ~~place indicated in Box 13, in such ready berth as the Charterers may direct.~~ 11
   ~~The Owners shall before and at the time of delivery exercise due diligence to~~ 12
   ~~make the Vessel seaworthy and in every respect ready in hull, machinery and~~ 13
   ~~equipment for service under this Charter. The Vessel shall be properly~~ 14
   ~~documented at time of delivery.~~
   ~~The delivery to the Charterers of the Vessel and the taking over of the Vessel~~ 15
   ~~by the Charterers shall constitute a full performance by the Owners of all the~~ 16
   ~~Owners' obligations under Clause 2, and thereafter the Charterers shall not~~ 17
   ~~be entitled to make or assert any claim against the Owners on account of any~~ 18
   ~~conditions, representations or warranties expressed or implied with respect~~ 19
   ~~to the Vessel but the Owners shall be responsible for repairs or renewals~~ 20
   ~~occasioned by latent defects in the Vessel, her machinery or appurtenances,~~ 21
   ~~existing at the time of delivery under the Charter, provided such defects have~~ 22
   ~~manifested themselves within 18 months after delivery unless otherwise~~ 23
   ~~provided in Box 30.~~ 24

3. **Time for Delivery** (*not applicable to newbuilding vessels*) *Back-to-back with* 25
   *Fr8 Spirit MOA dated 23rd August 2007 (See Clause 28).*
   ~~The Vessel to be delivered not before the date indicated in Box 14 unless with~~ 26
   ~~the Charterers' consent.~~ 27
   ~~Unless otherwise agreed in Box 17, the Owners to give the Charterers not less~~ 28
   ~~than 30 running days' preliminary and not less than 14 days' definite notice of~~ 29
   ~~the date on which the Vessel is expected to be ready for delivery.~~ *See Box 17* 30
   *for delivery notices.*
   ~~The Owners to keep the Charterers closely advised of possible changes in the~~ 31
   ~~Vessel's position.~~ 32

4. **Cancelling** (*not applicable to newbuilding vessels*) *Back-to-back with Fr8* 33
   *Spirit MOA dated 23rd August 2007 (See Clause 28).*
   ~~Should the Vessel not be delivered latest by the cancelling date indicated in~~ 34
   ~~Box 15, the Charterers to have the option of cancelling this Charter without~~ 35
   ~~prejudice to any claim the Charterers may otherwise have on the Owners~~ 36
   ~~under the Charter.~~ 37
   ~~If it appears that the Vessel will be delayed beyond the cancelling date the~~ 38
   ~~Owners shall, as soon as they are in a position to state with reasonable~~ 39
   ~~certainty the day on which the Vessel should be ready, give notice thereof to~~ 40
   ~~the Charterers asking whether they will exercise their option of cancelling,~~ 41
   ~~and the option must then be declared within one hundred and sixty-eight~~ 42
   ~~(168) hours of the receipt by the Charterers of such notice. If the Charterers~~ 43
   ~~do not then exercise their option of cancelling, the seventh day after the~~ 44
   ~~readiness date stated in the Owners' notice shall be regarded as a new~~ 45
   ~~cancelling date for the purpose of this Clause.~~ 46

5. **Trading Limits** 47
   The Vessel shall be employed in lawful trades for the carriage of suitable 48
   lawful merchandise within the trading limits indicated in Box 19. 49
   The Charterers undertake not to employ the Vessel or suffer the Vessel to be 50
   employed otherwise than in conformity with the terms of the instruments of 51
   insurance (including any warranties expressed or implied therein) without 52
   first obtaining the consent to such employment of the Insurers and complying 53
   with such requirements as to extra premium or otherwise as the Insurers may 54
   prescribe. If required the Charterers shall keep the Owners and the 55
   Mortgagees advised of the intended employment of the Vessel. 56
   The Charterers also undertake not to employ the Vessel or suffer her 57
   employment in any trade or business which is forbidden by the law of any 58
   country to which the Vessel may sail or is otherwise illicit or in carrying illicit 59
   or prohibited goods or in any manner whatsoever which may render her liable 60
   to condemnation, destruction, seizure or confiscation. 61
   Notwithstanding any other provisions contained in this Charter it is agreed 62
   that nuclear fuels or radioactive products or waste are specifically excluded 63
   from the cargo permitted to be loaded or carried under this Charter. This 64
   exclusion does not apply to radio-isotopes used or intended to be used for 65
   any industrial, commercial, agricultural, medical or scientific purposes 66
   provided the Owners' prior approval has been obtained to loading thereof. 67

6. **Surveys** (*not applicable to newbuilding vessels*) *see clause 29* 68
   ~~Survey on Delivery and Redelivery. - The Owners and Charterers shall each~~ 69
   ~~appoint surveyors for the purpose of determining and agreeing in writing the~~ 70
   ~~condition of the Vessel at the time of delivery and redelivery hereunder. The~~ 71
   ~~Owners shall bear all expenses of the On-Survey including loss of time, if any,~~ 72
   ~~and the Charterers shall bear all expenses of the Off-Survey including loss of~~ 73
   ~~time, if any, at the rate of hire per day or pro rata, also including in each case~~ 74
   ~~the cost of any docking and undocking, if required, in connection herewith.~~ 75

7. **Inspection** *see clause 31* 76
   Inspection. - The Owners shall have the right at any time to inspect or survey 77
   the Vessel or instruct a duly authorised surveyor to carry out such survey on 78
   their behalf to ascertain the condition of the Vessel and satisfy themselves 79
   that the Vessel is being properly repaired and maintained. Inspection or 80
   survey in dry-dock shall be made only when the Vessel shall be in dry-dock 81
   for the Charterers' purpose. However, the Owners shall have the right to 82
   require the Vessel to be dry-docked for inspection if the Charterers are not 83
   docking her at normal classification intervals. The fees for such inspection or 84
   survey shall in the event of the Vessel being found to be in the condition 85

provided in Clause 9 of this Charter be payable by the Owners and shall be 86
paid by the Charterers only in the event of the Vessel being found to require 87
repairs or maintenance in order to achieve the condition so provided. All time 88
taken in respect of inspection, survey or repairs shall count as time on hire 89
and shall form part of the Charter period. 90
The Charterers shall also permit the Owners to inspect the Vessel's log books 91
whenever requested and shall whenever required by the Owners furnish them 92
with full information regarding any casualties or other accidents or damage to 93
the Vessel For the purpose of this Clause, the Charterers shall keep the 94
Owners advised of the intended employment of the Vessel. 95

8. **Inventories and Consumable Oil and Stores** 96
   A complete inventory of the Vessel's entire equipment, outfit, appliances and 97
   of all consumable stores on board the Vessel shall be made by the Charterers 98
   in conjunction with the Owners on delivery and again on redelivery of the 99
   Vessel. The ~~Charterers and the~~ Owners, ~~respectively,~~ shall at the time of 100
   ~~delivery and~~ redelivery take over and pay for all bunkers, lubricating oil, *at* 101
   *actual purchased prices. Water and unbroached provisions, paints,*
   *oils, ropes and other consumable stores at delivery shall be the same*
   *quantity, quality at redelivery* water
   ~~and unbroached provisions, paints, oils, ropes and other consumable stores~~ 102
   ~~in the said Vessel at the then current market prices at the ports of delivery and~~ 103
   ~~redelivery, respectively.~~ 104

9. **Maintenance and Operation** 105
   (a) The Vessel shall during the Charter period be in the full possession and at 106
   the absolute disposal for all purposes of the Charterers and under their 107
   complete control in every respect. The Charterers shall maintain the Vessel, 108
   her machinery, boilers, appurtenances and spare parts in a good state of 109
   repair, in efficient operating condition and in accordance with good 110
   commercial maintenance practice and, except as provided for in Clause 13 111
   (l), they shall keep the Vessel with unexpired classification of the class 112
   indicated in Box 10 and with other required certificates in force at all times. 113
   The Charterers to take immediate steps to have the necessary repairs done 114
   within a reasonable time ~~failing which the Owners shall have the right of~~ 115
   ~~withdrawing the Vessel from the service of the Charterers without noting any~~ 116
   ~~protest and without prejudice to any claim the Owners may otherwise have~~ 117
   ~~against the Charterers under the Charter.~~ 118
   ~~Unless otherwise agreed, in the event of any improvement, structural changes~~ 119
   ~~or expensive new equipment becoming necessary for the continued~~ 120
   ~~operation of the Vessel by reason of new class requirements or by~~ 121
   ~~compulsory legislation costing more than 5 per cent. of the Vessel's marine~~ 122
   ~~insurance value as stated in Box 27, then the extent, if any, to which the rate of~~ 123
   ~~hire shall be varied and the ratio in which the cost of compliance shall be~~ 124
   ~~shared between the parties concerned in order to achieve a reasonable~~ 125
   ~~distribution thereof as between the Owners and the Charterers having regard,~~ 126
   ~~inter alia, to the length of the period remaining under the Charter, shall in the~~ 127
   ~~absence of agreement, be referred to arbitration according to Clause 26.~~ *See* 128
   *clause 9.1 below*
   The Charterers are required to establish and maintain financial security or 129
   responsibility in respect of oil or other pollution damage as required by any 130
   government including Federal, state or municipal or other divison or 131
   authority thereof, to enable the Vessel, without penalty or charge, lawfully to 132
   enter, remain at, or leave any port, place, territorial or contiguous waters of 133
   any country, state or municipality in performance of this Charter without any 134
   delay. This obligation shall apply whether or not such requirements have 135
   been lawfully imposed by such government or division or authority thereof. 136
   The Charterers shall make and maintain all arrangements by bond or 137
   otherwise as may be necessary to satisfy such requirements at the 138
   Charterers' sole expense and the Charterers shall indemnify the Owners 139
   against all consequences whatsoever (including loss of time) for any failure 140
   or inability to do so. 141
   ~~TOVALOP SCHEME. (Applicable to oil tank-vessels only). - The Charterers are~~ 142
   ~~required to enter the Vessel under the TOVALOP SCHEME or under any~~ 143
   ~~similar compulsory scheme upon delivery under this Charter and to maintain~~ 144
   ~~her so during the currency of this Charter.~~ 145
   (b) The Charterers shall at their own expense and by their own procurement 146
   man, victual, navigate, operate, supply, fuel and repair the Vessel whenever 147
   required during the Charter period and they shall pay all charges and 148
   expenses of every kind and nature whatsoever incidental to their use and 149
   operation of the Vessel under this Charter, including any foreign general 150
   municipality and/or state taxes. The Master, officers and crew of the Vessel 151
   shall be the servants of the Charterers for all purposes whatsoever, even if for 152
   any reason appointed by the Owners. 153
   Charterers shall comply with the regulations regarding officers and crew in 154
   force in the country of the Vessel's flag or any other applicable law. 155
   (c) During the currency of this Charter, the Vessel shall retain her present 156
   name as indicated in Box 5 and shall remain under and fly the flag as 157
   indicated in Box 5. Provided, however, that the Charterers shall have the 158
   liberty to paint the Vessel in their own colours, install and display their funnel 159
   insignia and fly their own house flag. Painting and re-painting, instalment and 160
   re-instalment to be for the Charterers' account and time used thereby to 161
   count as time on hire. 162
   (d) The Charterers shall make no structural changes in the Vessel or changes 163
   in the machinery, boilers appurtenances or spare parts thereof without in 164
   each instance first securing the Owners' approval thereof. If the Owners so 165
   agree, the Charterers shall, if the Owners so require, restore the Vessel to its 166
   former condition before the termination of the Charter. 167
   (e) The Charterers shall have the use of all outfit, equipment, and appliances 168
   on board the Vessel at the time of delivery, provided the same or their 169
   substantial equivalent shall be returned to the Owners on redelivery in the 170
   same good order and condition as when received, ordinary wear and tear 171
   excepted. The Charterers shall from time to time during the Charter period 172
   replace such items of equipment as shall be so damaged or worn as to be 173
   unfit for use. The Charterers are to procure that all repairs to or replacement 174
   of any damaged, worn or lost parts or equipment be effected in such manner 175

This document is a computer generated BARECON 89 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL).
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.



(both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners.
Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.
(f) The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once in every eighteen calendar months after delivery unless otherwise agreed in Box 18. *always per Class requirements (see clause 31)*

10. **Hire**
(a) The Charterers shall pay to the Owners for the hire of the Vessel at the lump sum per calendar month as indicated in Box 21 commencing on and from the date and hour of her delivery to the Charterers and at and after the agreed lump sum for any part of a month. Hire to continue until the date and hour when the Vessel is redelivered by the Charterers to her Owners.
(b) Payment of Hire, except for the first and last month's Hire, if sub-clause (c) of this Clause is applicable, shall be made in cash without discount every month in advance on the first day of each month in the currency and in the manner indicated in Box 23 and at the place mentioned in Box 24.
(c) Payment of Hire for the first and last month's Hire if less than a full month shall be calculated proportionally according to the number of days in the particular calendar month and advance payment to be effected accordingly.
(d) Should the Vessel be lost or missing, Hire to cease from the date and time when she was lost or last heard of. Any Hire paid in advance to be adjusted accordingly.
(e) Time shall be of the essence in relation to payment of Hire hereunder. In default of payment beyond a period of seven running days, the Owners shall have the right to withdraw the Vessel from the service of the Charterers without noting any protest and without interference by any court or any other formality whatsoever, and shall, without prejudice to any other claim the Owners may otherwise have against the Charterers under the Charter, be entitled to damages in respect of all costs and losses incurred as a result of the Charterers' default and the ensuing withdrawal of the Vessel.
(f) Any delay in payment of Hire shall entitle the Owners to an interest at the rate per annum as agreed in Box 22. If Box 22 has not been filled in the current market rate in the country where the Owners have their Principal Place of Business shall apply.

11. **Mortgage**
*) (a) Owners warrant that they have not effected any mortgage of the Vessel.
*) (b) The Vessel chartered under this Charter is financed by a mortgage according to the Deed(s) of Covenant annexed to this Charter and as stated in Box 26. By their counter-signature on the Deed(s) of Covenant, the Charterers undertake to have acquainted themselves with all terms, conditions and provisions of the said Deed(s) of Covenant. The Charterers undertake that they will comply with all such instructions or directions in regard to the employment, insurances, repairs and maintenance of the Vessel, etc., as laid down in the Deed(s) of Covenant or as may be directed from time to time during the currency of the Charter by the Mortgagee(s) in conformity with the Deed(s) of Covenant.
(c) The Owners warrant that they have not effected any mortgage(s) other than stated in Box 26 and that they will not effect any other mortgage(s) without the prior consent of the Charterers.
*) (*Optional, Clauses 11 (a) and 11 (b) are alternatives; indicate alternative agreed in Box 26*).

12. **Insurance and Repairs** *see clause 37*
(a) During the Charter period the Vessel shall be kept insured by the Charterers at their expense against marine, war and Protection and Indemnity risks in such form as the Owners shall in writing approve, which approval shall not be unreasonably withheld. Such marine, war and P. and I. insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and mortgagees (if any), and the Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. All insurance policies shall be in the joint names of the Owners and the Charterers as their interests may appear.
If the Charterers fail to arrange and keep any of the insurances provided for under the provisions of sub-clause (a) above in the manner described therein, the Owners shall notify the Charterers whereupon the Charterers shall rectify the position within seven running days, failing which Owners shall have the right to withdraw the Vessel from the service of the Charterers without prejudice to any claim the Owners may otherwise have against the Charterers.
The Charterers shall, subject to the approval of the Owners and the Underwriters, effect all insured repairs and shall undertake settlement of all costs in connection with such repairs as well as insured charges, expenses and liabilities (reimbursement to be secured by the Charterers from the Underwriters) to the extent of coverage under the insurances herein provided for.
The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.
All time used for repairs under the provisions of sub-clause (a) of this Clause and for repairs of latent defects according to Clause 2 above including any deviation shall count as time on hire and shall form part of the Charter period.
(b) If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 28 and Box 29, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.
(c) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause (a) of Clause 12, all insurance payments for such loss shall be paid to the Mortgagee, if any, in the manner described in the Deed(s) of Covenant, who shall distribute the moneys between themselves, the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the Mortgagee, if any, of any occurrences in consequence of which the Vessel is likely to become a Total Loss as defined in this Clause.
(d) If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Charterers in accordance with sub-clause (a) of this Clause, this Charter shall terminate as of the date of such loss.
(e) The Owners shall upon the request of the Charterers, promptly execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.
(f) For the purpose of insurance coverage against marine and war risks under the provisions of sub-clause (a) of this Clause, the value of the Vessel is the sum indicated in Box 27.

13. **Insurance, Repairs and Classification**
~~(*Optional, only to apply if expressly agreed and stated in Box 27, in which event Clause 12 shall be considered deleted*).~~
~~(a) During the Charter period the Vessel shall be kept insured by the Owners at their expense against marine and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or appurtenances covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. All insurance policies shall be in the joint names of the Owners and the Charterers as their interests may appear.~~
~~(b) During the Charter period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks in such form as the Owners shall in writing approve which approval shall not be unreasonably withheld. If the Charterers fail to arrange and keep any of the insurances provided for under the provisions of sub-clause (b) in the manner described therein, the Owners shall notify the Charterers whereupon the Charterers shall rectify the position within seven running days, failing which the Owners shall have the right to withdraw the Vessel from the service of the Charterers without prejudice to any claim the Owners may otherwise have against the Charterers.~~
~~(c) In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.~~
~~(d) The Charterers shall, subject to the approval of the Owners or Owners' Underwriters, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances provided for under the provisions of sub-clause (a) of this Clause. The Charterers to be secured reimbursement through the Owners' Underwriters for such expenditures upon presentation of accounts.~~
~~(e) The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.~~
~~(f) All time used for repairs under the provisions of sub-clause (d) and (e) of this Clause and for repairs of latent defects according to Clause 2 above, including any deviation, shall count as time on hire and shall form part of the Charter period.~~
~~The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.~~
~~(g) If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 28 and Box 29, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.~~
~~(h) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause (a) of this Clause, all insurance payments for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~
~~(i) If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause (a) of this Clause, this Charter shall terminate as of the date of such loss.~~
~~(j) The Charterers shall upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to insurers and claim a constructive total loss.~~
~~(k) For the purpose of insurance coverage against marine and war risks under the provisions of sub-clause (a) of this Clause, the value of the Vessel is the sum indicated in Box 27.~~
~~(l) Notwithstanding anything contained in Clause 9 (a), it is agreed that under the provisions of Clause 13, if applicable, the Owners shall keep the Vessel with unexpired classification in force at all times during the Charter period.~~

14. **Redelivery** *see clause 28*
The Charterers shall at the expiration of the Charter period redeliver the Vessel at a safe and ice-free port or place as indicated in Box 16. The Charterers shall give the Owners not less than 30 running days' preliminary and not less than 14 days' definite notice of expected date, range of ports of redelivery or port or place of redelivery. Any changes thereafter in Vessel's

This document is a computer generated BARECON 89 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.



position shall be notified immediately to the Owners. Should the Vessel be ordered on a voyage by which the Charter period may be exceeded the Charterers to have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow redelivery about the time fixed for the termination of the Charter.

The Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.

The Vessel upon redelivery shall have her survey cycles up to date and class certificates valid for at least the number of months agreed in Box 12.

**15. Non-Lien and Indemnity**

The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel.

The Charterers further agree to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter period a notice reading as follows:-

"This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and by the terms of the Charter Party neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

The Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter period while she is under the control of the Charterers, and against any claims against the Owners arising out of or in relation to the operation of the Vessel by the Charterers. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

**16. Lien**

The Owners to have a lien upon all cargoes and sub-freights belonging to the Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.

**17. Salvage**

All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**18. Wreck Removal**

In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

**19. General Average**

General Average, if any, shall be adjusted according to the York-Antwerp Rules ~~1974~~ *1994* or any subsequent modification thereof current at the time of the casualty.

The Charter Hire not to contribute to General Average.

**20. Assignment and Sub-Demise**

The Charterers shall not assign this Charter nor sub-demise the Vessel except with the prior consent in writing of the Owners which shall not be unreasonably withheld and subject to such terms and conditions as the Owners shall approve.

**21. Bills of Lading**

The Charterers are to procure that all Bills of Lading issued for carriage of goods under this Charter shall contain a Paramount Clause incorporating any legislation relating to Carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the Bills of Lading shall incorporate the British Carriage of Goods by Sea Act. The Bills of Lading shall also contain the amended New Jason Clause and the Both-to-Blame Collision Clause.

The Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.

**22. Bank Guarantee**

~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 25 as guarantee for full performance of their obligations under this Charter. (Optional, only to apply if Box 25 filled in).~~

**23. Requisition/Acquisition**

(a) In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter period or the period of the "Requisition for Hire" whichever be the shorter.

The Hire under this Charter shall be payable to the Owners from the same time as the Requisition Hire is payable to the Charterers.

(b) In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".

**24. War**

(a) The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(b) The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks Insurance on the Vessel the right to give any such orders or directions.

(c) In the event of outbreak of war (whether there be a declaration of war or not) between any two or more of the countries as stated in Box 31, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 14, if she has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near open and safe port as directed by the Owners, or if she has no cargo on board, at the port at which she then is or if at sea at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 10 and except as aforesaid all other provisions of this Charter shall apply until redelivery.

**25. Commission**

The Owners to pay a commission at the rate indicated in Box 32 to the Brokers named in Box 32 on any Hire paid under the Charter ~~but in no case less than is necessary to cover the actual expenses of the Brokers and a reasonable fee for their work. If the full Hire is not paid owing to breach of Charter by either of the parties the party liable therefor to indemnify the Brokers against their loss of commission.~~

~~Should the parties agree to cancel the Charter, the Owners to indemnify the Brokers against any loss of commission but in such case the commission not to exceed the brokerage on one year's Hire.~~

**26. Law and Arbitration**

*) 26.1. This Charter shall be governed by English law and any dispute arising out of this Charter shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single Arbitrator appointed shall apply. If two Arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

*) ~~26.2. Should any dispute arise out of this Charter, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court.~~

~~The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.~~

*) ~~26.3. Any dispute arising out of this Charter shall be referred to arbitration at the place indicated in Box 33, subject to the law and procedures applicable there.~~

*) ~~26.4. If Box 33 in Part I is not filled in, sub-clause 26.1. of this Clause shall apply.~~

*) ~~26.1., 26.2. and 26.3. are alternatives; indicate alternative agreed in Box 33.~~

*9.1 Maintenance and Operation*

*In the event of any improvement, structural, changes or expensive new equipment becoming necessary for the continued operation of the vessel by reason of new class requirement or by compulsory registation, if any, the cost of compliance shall be for Charterers account if the cost thereof does not exceed five percent (5%) of the vessel's insured value. In the event the said cost exceeds five percent (5%) of the vessel's insured value then the same shall be shared between Charterers and Owners in a manner to be discussed and mutually agreed.*

*Additional Clauses 27 to 44 and Special Clauses 1 to 4 form an integral part of this charter party.*

*For optional PART III, PART IV and PART V, see overleaf.*

This document is a computer generated BARECON 89 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is the copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved document shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.



# PART III
## PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 35)*

**Specifications and Building Contract**
(a) The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.
(b) No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.
(c) The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.
(d) The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein provided nevertheless that the Charterers shall be bound to accept the Vessel from the Owners on the date of delivery by the Builders as having been completed and constructed in accordance with the Building Contract and the Charterers undertake that after having so accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects if any except that in respect of any repair or replacement of any defects which appear within the first 12 months from delivery the Owners shall use their best endeavours to recover any expenditure incurred in remedying such defects from the Builders, but shall only be liable to the Charterers to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers) provided that the Charterers shall be bound to accept such sums as the Owners are able to recover under this clause and shall make no claim upon the Owners for any difference between the amounts so recovered and the actual expenditure incurred on repairs or replacements or for any loss of time incurred thereby.

**Time and Place of Delivery**
(a) Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. Notwithstanding the foregoing, the Charterers shall not be obliged to take delivery of the Vessel until she has been classed and documented as provided in this Charter and free for transfer to the flag she has to fly. Subject as aforesaid the Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and upon and after such acceptance the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery or otherwise howsoever.
(b) If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.
(c) If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon
i) if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or
ii) if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/or take delivery of the Vessel from the Builders and deliver her to the Charterers;
iii) in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;
iv) if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.

**Guarantee Works**
If not otherwise agreed, the Owners authorize the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.

**Name of Vessel**
The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.

**Survey on Redelivery**
The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery.
Without prejudice to Clause 14 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred.
The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of Hire per day or pro rata.

## PART IV
## HIRE/PURCHASE AGRREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 39)*

| | |
|---|---|
| On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the last month's hire instalment as per Clause 10 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. | 1 2 3 4 5 |
| If the payment of the instalment due is delayed for less than 7 running days or for reason beyond the Charterers' control, the right of withdrawal under the terms of Clause 10 (e) of Part II shall not be exercised. However any delay in payment of the instalment due shall entitle the Owners to an interest at the rate per annum as agreed in Box 22. If Box 22 has not been filled in the current market rate in the country where the Owners have their Principal Place of Business shall apply. | 6 7 8 9 10 11 |
| *In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.* | 12 13 |
| The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. | 14 15 |
| The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. | 16 17 18 19 20 21 22 23 24 25 26 |
| In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. | 27 28 29 30 31 |
| The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. | 32 33 34 |
| The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. | 35 36 |
| The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. | 37 38 39 40 41 |
| The Buyers undertake to pay for the repatriation of the Captain, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 2 (Part II) or to pay the equivalent cost for their journey to any other place. | 42 43 44 45 |

# PART V
## PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY
*(Optional, only to apply if expressly agreed and stated in Box 40)*

**Definitions**
For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them:
"The Bareboat Charter Registry" shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.
"The Underlying Registry" shall mean the registry of the State in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.

**Mortgage**
The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 11 (b) (Part II) shall apply.

**Termination of Charter by Default**
If the Vessel chartered under this Charter is registered in Bareboat Charter Registry as stated in Box 41, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 26, the Charterers shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 42.
In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 41, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter.

## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

### 27. Laycan:

1st July – 10th September 2007 with 10th September 2007 cancelling.

### 28. Delivery/Redelivery:

Place of delivery. Safely afloat at a safe and easily accessible berth, buoy or anchorage within range (to be advised).

The vessel shall be delivered to Charterers concurrently with the Owners taking delivery of the vessel under the moa dated 23rd August 2007 (ship has been inspected and accepted thus there will be no condition or underwater survey on delivery, only on redelivery.

Place of redelivery world-wide with usual exclusions.

The vessel shall be redelivered upon the disembarkation of Charterers' crew and officers after bottom inspection and condition survey have been completed.

### 29. Bottom Inspection and condition survey:

(a) On redelivery of the vessel, bottom inspection and condition survey shall be carried out by an independent surveyor who is appointed by Owners and approved by Charterers. Time and expense for bottom inspection and condition survey on redelivery shall be for Charterers' account.

(b) Bottom inspection on redelivery shall be carried out by a diver who shall be appointed by condition surveyor and authorized by Vessel's Class.

(c) Deleted.

(d) The Vessel shall be redelivered in the same or as good structures state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted. If the Vessel, when redelivered, is not in the condition as defined above Charterers shall restore the Vessel to the agreed condition at the time of redelivery at Charterers' time and expense.

(e) If at redelivery damage to the Vessel's underwater parts is not serious and does not affect the Vessel's seaworthiness, classification, trading or cargo operation, then such damage shall be repaired at the Vessel's first drydock after redelivery of the Vessel at Charterers' expense. Alternatively Charterers shall pay Owners a compensation the amount of which to be mutually agreed.



## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

### 30. Cancellation of bareboat charter: Deleted

### 31. Drydock:

Charterers have the obligation to drydock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always unextended at Charterers cost and expenses.

### 32. Major Oil Company's Approval: Deleted

### 33. Certificates:

The Vessel to be delivered/redelivered with DNV Class maintained, free of recommendations and average damages affecting Class and with all continuous survey cycles up-to-date without extension. All Class certificates and national and international trading and safety certificates according to Vessel's present flag shall be clean, valid for 12 months and unextended at the time of redelivery respectively.

### 34. Bunker Clause:

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time. Charterers shall have the option of supplying the vessel with 180 CST bunkers if environmental and local/national/international regulations permit

### 35. Charterers' Liabilities:

Charterers hereby indemnity Owners from and again any and all liabilities, claims losses, damage, costs or expenses suffered or Incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

### 36. Oil Pollution:

Charterers warrant that the Vessel shall have a full and valid P & I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One(1) billion per incident, provided, however, that If the P & I Club in which the Vessel entered and/or the underwriter(s) cease to provide Pollution Liability coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability cover (both basis P & I Clubs and Additional insurance) in the highest amount(s) then made available by any First Class Underwriter.



## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

**37. Risks and Insurance of the Vessel:**

(a) For the purpose of this Charter, 'Total Loss' has the meaning given to it in Clause 12(c) above, 'Compulsory Acquisition' has the meaning given to it In Clause 23(b) above and 'Major Casualty' means an casualty to the Vessel or Incident (other than a Total Loss) in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars(US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk of the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurances referred to in Clause 12 above and this Clause 37, the Owners shall be entitled to effect and maintain for Its own benefit and at its own cost, innocent Owner's interest insurance for an amount to be determined by Owners In Owners' sole discretion and, for the benefit of any mortgagee or mortgagees pursuant to Clause 11(b) above, mortgagees' Indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligations under Clause 12 above:

i) to effect and maintain sufficient insurance on and over the Vessel in respect of hull, machinery and equipment, marine and war risks (Including excess risks), protection and indemnity risks, FD and D and oil pollution liability (If appropriate) upon such terms as shall from time to time be approved in writing by the Owners and in such amounts in United States Dollars form time to time as are set out in the Schedule to these Additional Clauses in the case of hull, machinery and equipment, marine and war risks and excess risks and in the case of protection and Indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and Indemnity association in which the Vessel Is from time to time entered;

ii) without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurances under terms not less favourable than those of institute Time clauses Hulls edition 1.10.83 and for as amended from time to time, the Institute Additional Perils Hulls edition 1.10.83 and Institute War and Strike clauses Hull Time edition 1.10.83 with USD 225,000 deductibles. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel with a protection and Indemnity association, with basic deductibles, and also fully cover the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand million United States Dollars (US$1,000,000,000) and to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.



### ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

iii) to effect the insurances aforesaid through first class West European or U.S brokers, insurance companies, underwriters and war risks associations operating in the London or American Insurance market and protection and indemnity associations which are members of the International Group of Protection and Indemnity Associations. It Is understood and agreed, however, that In the event Charterers wish to place the Vessel's insurances with non-West European or non-U.S. brokers then such shall be further discussed and mutually agreed in due course;

iv) to renew the insurances aforesaid at least seven (7) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms arid conditions of such renewal as and when the same occurs;

v) punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

vi) to procure that a loss payable clause in such form as may be required by the Owners in endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued In respect of the insurance of the vessel;

vii) to procure that all such instruments of Insurance referred to sub-clause iv above as are effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with pro-forma copies and a letter or letters of undertaking in such form as may be required by the Owners;

vii) to procure that the protection and Indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the Vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

ix) to apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

x) not to alter any of the terms of any of the instruments of Insurance referred to In sub-clause vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument of insurance invalid, void, voidable or unenforceable or render any sum payable thereunder repayable In whole or In part;

xi) not without the prior written consent of the Owners to settle, compromise or abandon any claim for a Total Loss or a Major Casualty.



### ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 12 above and this Clause 37 shall be payable as follows;

　i) there shall be paid to the Owners all sums receivable in respect of a Total Loss, and, unless otherwise authorized by the Owner, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the Charterers' furnishing evidence satisfactory to the Owners that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs In the course of their being effected;

　ii) all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 12 above and this Clause 37 shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 12 above and this Clause 37 so permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the Insurance cover required by this Charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers expense, such additional or alternative insurance as the Owners may in their discretion determine to be necessary or describe to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

**38. Supernumeraries:**

Charterers may place 1 or 2 representative on board the Vessel for familiarization purpose before delivery. Such representatives are to be permitted to remain onboard the Vessel without interference to the Vessel's operation upto the time of delivery subject to signing Owners' P & I Club Indemnity forms which shall be presented to them for signature upon boarding.



## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

**39. P and C:**

All negotiations and fixture to be kept strictly private and confidential by all parties hereto and shall not be reported. Private and confidential Clause becomes null and void if the shipowning company or its affiliates list on any stock exchange.

**40. Interest**

The Charterers shall pay on demand by the Owners Interest on any sum due under this Charter and unpaid from and including the date which It fell due for payment (subject as provided below) until the date of actual payment(as well after as before judgment) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one month London Interbank Offer rate (LIBOR) plus 3 percent (3%) per annum, provided always that where the Owners pay or incur any such costs, charges expenses, claims, liabilities, losses, penalties, fines, duties, fees, taxes or other moneys as are stated in this Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to Indemnity the Owners, interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid.

All payments of interest to be made under this Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

**41. Charterers' Covenants:**

The Charterers Covenant with the Owners and undertake throughout the term of this Charter that:

(a)   they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonably require including (without limitation) information regarding the employment, condition, geographical position and crewing of the Vessel;

(b)   they will, forthwith upon becoming aware of the same, notify the Owners In writing of any Termination Event (or event of which they are aware which, with the giving of notice and/or lapse of time, would constitute a Termination Event);

(c) they will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;



## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

(d) In the event that the condition of the vessel has deteriorated more than fair wear and tear, costs of inspection to be for Charterers account.

(e) they will notify the Owners forthwith by telex, telefax or e-mail of:

i) any accident to the Vessel or incident which is or is likely to be a Major Casualty;

ii) any occurrence resulting in the Vessel becoming or being likely to become a Total Loss;

iii) any requirement or recommendation made by any Insurer or classification society, or by any competent authority, which is not compiled with within any time limit imposed by such insurer, classification society or authority;

iv) any arrest of the Vessel, or the exercise or purported exercise of any lien on the Vessel or any requisition of the Vessel for hire;

(f) they will procure that at all times the Vessel is managed only by the Charterers or Charterer' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) they will maintain the Vessel at all times in accordance with the requirements of DNV +A1 Tanker for Oil Products and Chemicals ESP SPM E0 VCS-2 BIS TMON NAUTICUS(Newbuilding) and to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) that the Vessel Shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners In and to the Vessel.

**42.Indemnity:**

The Charterers shall pay to the Owners on demand, and Indemnity and keep the Owners Indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal), liabilities, losses, penalties, fines, duties and fees (including, but not limited to, legal fees and expenses on a full indemnity basis)and taxes thereon suffered or incurred by the Owners arising directly or Indirectly in any manner our of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, Insurance, Use, operation, return, redelivery, laying up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent Ownership of the Charterers or any part thereof or from any maintenance, service, modification, repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of When the same shall arise and whether or not the Vessel or other



## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

vessel or the relevant part thereof is in the possession or control of the Charterers;

The indemnities contained in this Clause 42, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners, of this Charter.

### 43. Termination Events:

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) the Charterers fail to make any payment on its due date or in respect of moneys payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) the Charterers are in breach of any one or more of the provisions of this Charter relating to the Insurance of the Vessel;

(C) the Charterers fail to comply with any provision of this charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners consider capable of remedy. Such default continues for a period of fourteen (14) days after the Owners, by notice to the Charterers, require the same to be remedied:

(d) any license, approval, consent authorization or registration at any time necessary for the validity, enforceability or admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder, or in connection with the Ownership or operation of the Vessel is revoked, withheld or expires, or is modified in what the Owners consider a material respect;

(e) the Vessel becomes a Total Loss as defined in clause 12 c;

(f) a petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers, or if the Charterers suspend payment of, or are unable to or admit inability to pay, their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) as administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress is levied upon, the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or if the Charterers apply for, or consent to, any such appointment;



### ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

(h) the Charterers cease, or threaten to cease, to carry on their business, or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

(i) the Vessel is the subject of a Compulsory Acquisition;

(k) it becomes impossible or unlawful for the Charterers to fulfill any of their obligations under this Charter, or for the Owners to exercise any of the rights vested in them by this Charter;

Each of the events specified in this Clause 43 shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover the amounts specified in Clause 44(b) below to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled Under this Charter or at law, in equity or otherwise as a consequence of the occurrence of a Termination Event.

**44. Owners' Rights on a Termination Event:**

(a) If any Termination Event shall occur, the Owners may thereupon and at any time thereafter at their option take any one or more of the following actions:

i) take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses suffered or incurred by the Owners in doing so;

ii) by notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter. Either immediately or on such date as the Owners may specify, whereupon:

(A) the Vessel shall no longer be In the possession of the Charterers with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and In the condition governing redelivery as specified under this Charter; and

(13) the Owners shall be entitled but not bound (and without prejudice to the Charterers' obligation under sub-clause(A) above to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-Charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability o the part of the Owners and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) if the Owners give notice pursuant to sub-clause (a) above to terminate the



## ADDITIONAL CLAUSES TO M/T "FR8 SPIRIT" TBRN "NAVIG8 SPIRIT" CHARTER PARTY DATED 23rd AUGUST 2007

chartering of the Vessel by the Charterers, the Charterers shall forthwith pay to

The Owners all sums of money whether of hire or otherwise due and payable but unpaid this Charter upon which the Charterers obligation to pay hire shall cease and the Vessel shall be redelivered to the Owners In accordance with this Charter Party.

(c) At any time after giving notice of termination In accordance With sub-clause (a) above the Owners shall be entitled (but not bound) to Sell the Vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their absolute discretion think fit.

(d) Termination of the chartering of the Vessel and/or repossession of the Vessel by the Owners shall not relieve the Charterers from any of their obligations under this Charter and the Charterers shall continue to comply with their obligations until such time as the Owners have unconditionally received all amounts payable by the Charterers under this Clause 44.

**45.**
Owners to have the option to replace the existing bareboat contract with a Shelltime 4 / Shipman 98 contract which to reflect the terms of the bareboat contract. Shelltime 4 / shipman contract to come into force maximum 10 days from date of declaration of option.

**46.**
Delivery of the Vessel to the Charterers is to be back to back with FR8 Spirit MOA dated 23rd August 2007.

## SPECIAL CLAUSES

**1. Speed and Consumption. Deleted**

**2. Insured Value**

Owners agree the vessel's insured value to be fixed at US$ 53 million for the first three years of the Charter period, US$ 50 million for years 4 and 5, US$ 49 million for years 6 and 7, US$ 47 million for year 8 and US$46 million for years 9 and 10 if declared.

**3. War cancellation**

Box 31 Charterers confirm that this is for War only between two (2) or more of the countries as stated as per clause 24 of the Part II.

**The End**